IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BARBARA L. MARTA,                :    CIVIL ACTION
                                 :    NO. 09-601-ER
        Plaintiff,               :
                                 :
        v.                       :
                                 :
MICHAEL J. ASTRUE,        :
Commissioner of                  :
Social Security,                 :
                                 :
        Defendant.               :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        JUNE 2, 2010


## I.    INTRODUCTION

        Presently before the Court is Plaintiff Barbara Marta's
("Plaintiff") appeal, brought pursuant to 42 U.S.C. § 405(g),
seeking review of the decision of the Commissioner of the Social
Security Administration ("Commissioner" or "Defendant") denying
her applications for Disability Insurance Benefits ("DIB") under
Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401
et seq., and Supplemental Security Income ("SSI") under Title XVI
of the Act.

        Before the Court are the parties' motions for summary
judgment.  For the reasons that follow, Plaintiff's motion for
summary judgment will be denied, and Defendant's cross-motion for
summary judgment will be granted.  The decision of the
Commissioner will be affirmed.

## II.    FACTUAL BACKGROUND

### A.   Plaintiff's Background

Plaintiff was born on September 29, 1963.  (See Pl.'s App. Vol. 1, Soc. Sec. Admin. Office of Disability Adjudication & Review Decision at 15, hereinafter "ALJ Decision".)  Plaintiff completed school through the twelfth grade, obtained additional cosmetology training, and has relevant past work experience as a sales clerk and as a hairdresser.  (See Def.'s Br. at 5; see also ALJ Decision at 15.)

Plaintiff claims that she is disabled due to right knee arthritis, anxiety, and depression.  (See Pl.'s Br. at 9.)  The alleged onset date of Plaintiff's impairments is May 1, 2005, which is approximately when she took a fall at age forty-one. (Def.'s Br. at 5.)  At the time of her hearing before Administrative Law Judge Melvin D. Benitz ("ALJ") on September 2, 2008, Plaintiff had worked sporadically as a hairdresser since sustaining her knee injury.  (ALJ Decision at 10.)

### B.   Plaintiff's Medical History

Between Plaintiff's alleged onset date of May 1, 2005, and the hearing date of September 2, 2008, at least eleven doctors, including Plaintiff's treating physicians and doctors working for Delaware state agencies, treated or evaluated Plaintiff for her knee impairment or for her depression and anxiety.  (See id. at 4, 6, 7, 10-13.)  Their conclusions ranged from Plaintiff having no limitations on her daily living or social functions to Plaintiff having a medical impairment

2

expected to last continuously for twelve months.[1]  (Id. at 12-14.)

### 1.   Physical Impairments

Mohammad Kamali, M.D., treated Plaintiff's knee impairment from June 21, 2006, through July 11, 2007.  Dr. Kamali diagnosed Plaintiff in 2006 "with medical compartment degenerative arthritis of the right knee with signs of a prior sprain of the medical collateral ligament[,]" and noted that there were "signs of degenerative arthritis of the tibial plateau and an insufficient ACL [anterior cruciate ligament]."  (Id. at 5.)

On November 28, 2006, Dr. Kamali conducted the first of several evaluations of Plaintiff's knee for the Delaware Division of Social Services, concluding that Plaintiff would not be able to work full time for four months.  Then, on February 22, 2007, Dr. Kamali said that Plaintiff would be unable to work for an additional three months.  (Id. at 12.)  Shortly thereafter, Dr. Kamali recommended a knee replacement, classified Plaintiff's knee condition as disabling, and said Plaintiff "was expected to have a medical impairment that lasted for a continuous period of 12 months."  (Id.)  On May 16, 2007, Dr. Kamali now said Plaintiff should remain out of work for an additional three

_____

[1]    An impairment lasting for twelve months is a necessary element to proving a disability claim.  See infra note 6.

3

months.[2]

Joseph Mesa, M.D. evaluated Plaintiff on August 8, 2007, and recommended physical therapy and bracing of Plaintiff's knee.  On August 29, 2007, Dr. Mesa recommended surgery to reconstruct Plaintiff's ACL.  (Id. at 6.)  Dr. Mesa limited Plaintiff from working on July 31, 2008, until her knee could be "managed."  (Id. at 13.)  The same day, Plaintiff told Dr. Mesa that, although she had been feeling pain, she was no longer experiencing instability like she once had.  (Id.)

On August 28, 2008, Plaintiff was evaluated by James Rubano, M.D., who conducted imaging studies that showed a large joint effusion, considerable arthritis, and a ruptured ACL. However, Dr. Rubano urged Plaintiff to delay a knee replacement, saying she was "managing fairly well with periodic cortisone injections."[3]  (Id. at 6.)

At the hearing before the ALJ, Plaintiff testified to the following: (1) she had her knee drained every three to four weeks and got a cortisone injection every three months; (2) she took prescription and over-the-counter pain medication and iced

---

[2]     In June and July of 2007, Dr. Kamali noted that Plaintiff was unable to undergo surgery on her knee because she was a single mother and had a job.  (Id. at 5.)

[3]     Dr. Rubano added that "it was understandable for the [Plaintiff] to collect disability to help run her family as a single mother" and that her usual occupation of hairdresser put stress on her knee.  (Id. at 13.)

her knee four to five times per day; and (3) she was able to work eight to twelve hours per week for six months in 2007, but needed to ice her knee for an hour prior to going to her hairstyling job. (Id. at 10.) Plaintiff further testified that she could lift twenty pounds; must stand for at least five to ten minutes once per hour; could sit for twenty minutes; could walk 150 yards; and had constant pain in her knee. Plaintiff also indicated that she was not computer literate and knew only how to perform the job of hairdresser. (Id.)

### 2.   Mental Impairments

On February 12, 2006, Plaintiff was admitted to Christina Hospital due to alcohol withdrawal. Plaintiff indicated that she had recently lost her job because of her alcohol usage. She also reported that she had been hospitalized in 2000 for major depression and psychosis. Plaintiff was prescribed anxiety medication, put on an alcohol withdrawal program, and released after a three-night stay.[4] (Id. at 7.)

In January of 2007, Plaintiff reported to a Delaware Disability Determination Services ("DDS") worker that she was taking depression medication occasionally, and in November of that year, she reported to a DDS worker that she had not been seeing her therapist regularly. (Id. at 11.)

On December 3, 2007, Ramnik Singh, M.D. diagnosed

---

[4]   Plaintiff also had her knee drained of fluid during her hospital stay.

Plaintiff with anxiety disorder and alcohol dependence, in remission, but noted that she maintained a good rapport.  (Id. at 6.)

At the hearing before the ALJ, Plaintiff testified that she took anxiety medication and occasionally a sleeping aid. (Id. at 10.)  Plaintiff's mother, Anna Sentman, testified that Plaintiff was depressed about her situation, cried at times, was less social than she had been in the past, and seemed to be a different person than she was prior to her injury.  (Id. at 9.)

## III. PROCEDURAL HISTORY

Prior to Plaintiff filing suit on August 13, 2009, she pursued the appropriate administrative remedies.[5]  On September 1, 2006, Plaintiff filed applications for SSI and DIB.  (Id. at 1.)  After these applications were denied upon review and upon reconsideration on February 5, 2007, Plaintiff requested a hearing before an Administrative Law Judge, which occurred on September 2, 2008.

At the hearing, Plaintiff was represented by counsel, appeared and testified.  Vocational expert Christina L. Beatty-Cody ("VE") also appeared and testified, as did Plaintiff's mother, Anna Sentman.  (Id.)  The ALJ decided that Plaintiff was

---

[5]     Plaintiff meets the insured status requirements of the Social Security Act, as her date-last-insured is June 30, 2010. See 20 C.F.R § 404.130.

not disabled under the Social Security Act,[6] from the alleged onset date through the date of the ALJ's decision.  (Id. at 16.)

On June 24, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby finalizing the Commissioner's decision to deny benefits.  (Doc. 2, Ex. A, Appeals Council Decision.)  See Sims v. Apfel, 530 U.S. 103, 106-07 (2000) ("[I]f, as here, the [Appeals] Council denies the request for review, the ALJ's opinion becomes the final decision.").

Plaintiff subsequently filed this complaint, pursuant to 42 U.S.C. § 405(g), seeking reversal of the decision that Plaintiff was not disabled.  (Doc. 2.)  Plaintiff filed a motion for summary judgment and opening brief in support of the motion.  (Docs. 16, 17.)  In response, Defendant filed a cross-motion for summary judgment and a brief opposing Plaintiff's motion and in support of his cross-motion.  (Docs. 18-20.)  Plaintiff did not file a reply brief, although she was given the opportunity to do so.  (Doc. 15.)

IV.  **LEGAL STANDARD**

   A.  **Five-Step Process To Evaluate Disability Claims**

---

[6]   A claimant is "disabled" under the Social Security Act if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 416.905, 404.1505.

The Commissioner has established a five-step sequential process to evaluate disability claims.  20 C.F.R. §§ 416.920(a), 404.1520(a); see generally Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 502-03 (3d Cir. 2009) (reviewing the five-step evaluation process provided in the regulations); see also Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999)) (discussing the five-step evaluation process).

The first step is to determine whether the claimant is engaging in substantial gainful activity.  Plummer, 186 F.3d at 428.  If a claimant is not engaging in substantial gainful activity, the inquiry continues.  Step two is to decide whether the claimant suffers from a "severe" impairment.[7]  Id.  If the claimant's impairments are severe, the Commissioner moves to step three, in which "the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work."  Id.  If the claimant's impairment does not match up with a listed impairment or its equivalent, the analysis continues.  Step four requires the Commissioner to determine whether the claimant's residual functioning capacity[8] allows the claimant to return to her past

_____

[7]     An impairment is "severe" if it "significantly limits [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521, 416.921.

[8]     Residual functioning capacity is defined as "the most [claimant] can still do despite [her mental and physical]

8

relevant work.  Id.  It is the claimant's burden to show that she is unable to resume her past relevant work.  If the claimant meets her burden, the analysis proceeds to the final step.  Id. In step five, the Commissioner has the burden of demonstrating that the claimant is able to perform other work, and that such work is available in the national economy given the claimant's "medical impairments, age, education, past work experience, and residual functional capacity."  20 C.F.R. §§ 416.920, 404.1520; see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 205-06 (3d Cir. 2008) ("[T]he Commissioner [must] 'show that other jobs exist in significant numbers in the national economy that the claimant could perform.'" (quoting Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005))).  If the Commissioner shows that a claimant is able to perform other work that exists in the national economy, the claimant will be found not to be disabled.

### B.   Substantial Evidence Standard Of Review

In reviewing the Commissioner's final determination that a person is not disabled and therefore is not entitled to Social Security benefits, the Court is precluded from independently weighing the evidence or substituting its own conclusions for those reached by the ALJ.  Burns v. Barnhart, 312

---

limitations[,]" and is based on an assessment of all of the relevant medical and other evidence in claimant's case.  20 C.F.R. §§ 416.945(a), 404.1545(a).

F.3d 113, 118 (3d Cir. 2002).  Rather, the Court must review the factual findings presented in order to determine whether they are supported by substantial evidence.  42 U.S.C. § 405(g); Rutherford, 399 F.3d at 552.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion.  Diaz, 577 F.3d at 503 (quoting Plummer, 186 F.3d at 427).  Evidence is not substantial if the Commissioner failed to consider all of the relevant evidence or neglected to resolve conflicts created by countervailing evidence.  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000); see also Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000).

It follows that if the ALJ's decision is supported by substantial evidence, the Court may not set it aside even if the Court would have decided the factual inquiry differently.  Diaz, 577 F.3d at 503 (citing Plummer, 186 F.3d at 427); see also Rutherford, 399 F.3d at 552 ("In the process of reviewing the record for substantial evidence, we may not weigh the evidence or substitute [our own] conclusions for those of the fact-finder." (citations and internal quotation marks omitted)).

## V.    SUMMARY OF ALJ'S FINDINGS

In a decision dated December 18, 2008, the ALJ determined that Plaintiff was not disabled under 42 U.S.C. §§ 416(i), 423(d), or 1382c(a)(3)(A).  (ALJ Decision at 17.)

### A. Plaintiff Had The Severe Impairments of Right Knee Arthritis, Anxiety, And Depression

The ALJ found that the medical record indicated that Plaintiff's physical impairments were a "mild restriction" on her activities of daily living, while her mental impairments placed "mild difficulties" on her social functioning. (Id. at 8.) The ALJ deemed Plaintiff to have the severe impairments of right knee arthritis with anterior cruciate ligament (ACL) insufficiency, anxiety, and depression. (Id. at 4.)

### B. Despite Plaintiff's Severe Impairments, Plaintiff Could Perform Light Or Sedentary Work

The ALJ found, however, that Plaintiff did not "have an impairment or combination of impairments that meets or medically equals one of the [Commissioner's] listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1[,]" (id. at 7), and therefore could not automatically be deemed "disabled." See 20 C.F.R. §§ 416.920, 404.1520 ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 . . . and meets the duration requirement, we will find that you are disabled.").

The ALJ then found that Plaintiff's residual functioning capacity would allow her to perform certain light work or sedentary work as defined in 20 C.F.R. §§ 416.967(a)-(b), 404.1567(a)-(b), with several restrictions including alternating between sitting and standing.

Specifically, the ALJ determined that Plaintiff:

[H]as the residual functional capacity to perform low

11

> concentration, low stress, low memory, simple, routine,
> unskilled sedentary or light work . . . except that she
> can lift 20 pounds occasionally, 10 pounds frequently,
> sit for 20 to 30 minutes, stand for 20 to 30 minutes
> consistently on an alternate basis during an 8 hour day,
> 5 days a week with no prolonged climbing, balancing or
> stooping, avoiding exposure to ladders, ropes, scaffolds,
> stairs, heights and hazardous machinery, temperature and
> humidity extremes, and is able to attend tasks and
> complete schedules.[9]

(ALJ Decision at 9.)  The ALJ also determined that Plaintiff

would be "unable to perform any past relevant work[,]" but that

sufficient jobs existed in the national economy to allow

Plaintiff to work.  (Id. at 15.)

### C.   Jobs Plaintiff Could Perform Existed in the National Economy

The ALJ enlisted the VE's testimony to determine

whether jobs existed in the national economy for a person of

Plaintiff's age, work experience, education level, and residual

functioning capacity (including the above-mentioned

restrictions).  (Id. at 16.)  The VE testified that, given these

factors, there were at least several examples of jobs that

Plaintiff would be able to perform and that existed in ample

numbers in the national economy, with several of those jobs

existing in the regional economy as well.  These jobs included

---

[9]   This was part of the vocational hypothetical that the
ALJ presented to the VE in order to determine whether jobs
existed that Plaintiff would be able to perform.  (See infra
Section (V)(C).)

the light work[10] jobs of collator, photocopy machine operator, and mail room clerk; and the sedentary work[11] jobs of type copy examiner, table worker, and bench hand.  (Id.)  The VE further testified that her testimony was consistent with the Dictionary of Occupational Titles, see 20 C.F.R. §§ 416.966(d), 404.1566(d), except for her testimony regarding an option for Plaintiff to alternate between sitting and standing, which was based upon her experience in vocational rehabilitation.  (ALJ Decision at 16.)

## VI.  ANALYSIS

### A.  The ALJ Gave Proper Weight To Opinions Of Plaintiff's Treating Physicians

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of three of Plaintiff's treating physicians: Dr. Kamali, Dr. Mesa, and Dr. Rubano.  (See Pl.'s Br. at 8-11.)

A treating physician's opinion is entitled to controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not

---

[10]    Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." A job in this category can include "a good deal of walking or standing, or . . . some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[11]    Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." A sedentary job involves sitting, but "a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. §§ 404.1567(a), 416.967(a).

inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 416.927(d)(2), 404.1527(d)(2). However, a treating physician's opinion "may be afforded 'more or less weight depending upon the extent to which supporting explanations are provided.'" Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008) (quoting Plummer, 186 F.3d at 429). Furthermore, "a statement by a plaintiff's treating physician that she is 'disabled' or 'unable to work' is not dispositive." Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994). Moreover, an ALJ may outright reject a treating physician's opinion if there is contradictory medical evidence. Brownawell, 554 F.3d at 355.

### 1.   Dr. Kamali's Opinion

Plaintiff acknowledges that Dr. Kamali's opinion that her condition was disabling is not binding upon the Commissioner. However, Plaintiff argues that more weight should have been afforded to Dr. Kamali's conclusion that Plaintiff could not work in her current condition, could not work until she could get a knee replacement, and should delay knee replacement for the foreseeable future. (Pl.'s Br. at 9-10.)

The Court disagrees, and finds that the ALJ gave proper weight to Dr. Kamali's opinion. (See ALJ Decision at 14 (applying "some weight" to Dr. Kamali's opinion that "claimant's knee impairment is more significant than a mild limitation[,]" and "little weight" to Dr. Kamali's opinion that claimant's limitations are ongoing and that she is disabled for purposes of

14

receiving Delaware state benefits).)  The ALJ agreed with Dr. Kamali's conclusion that, without surgery, Plaintiff's knee impairment would continue for more than 12 months.  The ALJ also agreed that Plaintiff would not be able to perform her previous job of hairdresser because standing for eight hours daily would adversely affect Plaintiff's knee condition.  However, even though Plaintiff could not perform the job of a hairdresser because it would require constant standing, the ALJ took Plaintiff's limitations into consideration in determining her residual functional capacity and the jobs Plaintiff would be able to perform.

Also, as Plaintiff concedes, Dr. Kamali's reports made in connection with Delaware state agencies are not binding on the Commissioner, regardless of whether he identified Plaintiff as disabled.  (Pl.'s Br. at 11)  Delaware's requirements for a finding of disability under state law are not dispositive as to whether a claimant meets the requirements of the Social Security Administration.  Furthermore, even when a medical source states that a claimant is "disabled" or "unable to work," the determination of disability is a legal determination for the Court to make, and a treating physician's statements that a claimant cannot work are "not dispositive."  Adorno, 40 F.3d at 47-48.

### 2.  Dr. Mesa's Opinion

Plaintiff further argues that Dr. Mesa's recommendation

that she remain out of work until her knee impairment could be
"managed" should have been afforded greater weight, as Dr. Mesa
was one of Plaintiff's treating physicians.  (Pl.'s Br. at 10.)

The Court disagrees, and finds that the ALJ afforded
proper weight to Dr. Mesa's opinion.  (See ALJ Decision at 14
(assigning "little weight to Dr. Mesa's opinion").)  It is not
explicitly clear what Dr. Mesa meant by saying that Plaintiff
should remain out of work until her knee could be "managed."
Even if he meant she should not return to work until she had a
knee replacement, he likely was referring to her former work as a
hairdresser.  The ALJ agreed that Plaintiff should not return to
her job as a hairdresser.  But the ALJ found, and the Court
agrees, that substantial evidence in the record indicates that
Plaintiff would be able to perform work other than hairdressing.

### 3.  Dr. Rubano's Opinion

Plaintiff contends that the ALJ should have given more
weight to Dr. Rubano's opinion that Plaintiff could not work
because her usual occupation put too much stress on her knee.
(Pl.'s Br. at 10.)

The Court finds that the ALJ gave proper weight to Dr.
Rubano's opinion.  (See ALJ Decision at 14 (assigning "little
weight to Dr. Rubano's opinion").)  As the Court has already
explained, the ALJ agreed that Plaintiff should not return to her
hairdressing position, but found that other jobs existed that
Plaintiff could perform and that would not place excessive stress

16

on Plaintiff's knee.  Although Dr. Rubano believed that
Plaintiff's financial need should allow her to collect benefits,
Plaintiff concedes that financial need is not a determining
factor for disability purposes.  (Pl.'s Br. at 11.)  In addition,
Dr. Rubano noted on August 28, 2008, that Plaintiff was "managing
fairly well with periodic cortisone injections."  (ALJ Decision
at 6.)  This statement constitutes further evidence that
Plaintiff could perform other work despite her physical
limitations.

### 4.   Contrary Opinions Of Other Physicians

Plaintiff's argument that the ALJ should have given
more weight to the opinions of the above-mentioned physicians is
countered by other physicians' opinions in the record stating
that Plaintiff had only few mental and physical limitations.
(See ALJ Decision at 12-14.)  For example, Hillil Raclaw, Ph.D.,
concluded that Plaintiff was not limited in her activities of
daily living or social functioning, and had mild limitations in
concentration, persistence and pace.  (Id. at 12.)  Also, Carlene
Tucker-Okine, Ph.D., determined that Plaintiff had no limitations
in her daily living or social functioning, and that Plaintiff
could perform low stress tasks if her alcohol abuse remained in
remission.  (Id. at 13.)  While these consultants were engaged by
the State, and their opinions are not binding on the
Commissioner, their opinions are noteworthy because they are
inconsistent with the treating physicians' opinions that

17

Plaintiff urges the Court to accept.

A treating physician's opinion "may be afforded 'more or less weight depending upon the extent to which supporting explanations are provided[,]'" Brownawell, 554 F.3d at 355 (quoting Plummer, 186 F.3d at 429), and is not entitled to controlling weight if it is "inconsistent with the other substantial evidence" in the record, 20 C.F.R. §§ 416.927(d)(2), 404.1527(d)(2).  The contrary opinions of other physicians in this case substantially diminished the weight the ALJ was required to afford the opinions of Plaintiff's treating physicians.

The Court finds that the ALJ properly considered the entire medical record in determining that Plaintiff could perform other work, even though she could no longer perform the job of hairdresser.  Given all of the medical evidence, including Plaintiff's limitations on standing, as well as the opinions of the State's physicians and psychologists, there is substantial evidence in the record to support the ALJ's finding that Plaintiff could perform a limited range of light and sedentary work, including jobs that would not require prolonged sitting or standing.  (ALJ Decision at 15-16.)

**B.    The ALJ Properly Considered Testimony Of Plaintiff And Plaintiff's Mother**

Plaintiff argues that she takes depression and anxiety medications that "affect her concentration, persistence, and pace

18

on a regular basis[,]" and that her mother's statements corroborated that Plaintiff suffers from pain and depression relating to her financial problems.  In addition, Plaintiff emphasizes her mother's testimony that Plaintiff often must interrupt her daily activities to care for her knee.  (Pl.'s Br. at 11.)

The Court finds that the ALJ properly took this testimony into account when he determined Plaintiff's limitations, which the ALJ and the VE considered when determining which jobs Plaintiff would be capable of performing.  (ALJ Decision at 9, 16.)  Plaintiff's testimony is consistent with the ALJ's determination that Plaintiff could perform unskilled work requiring low concentration, low stress, and low memory.  (Id.; see also Def.'s Br. at 17.)

Until step five of the evaluation process, the burden is on Plaintiff to establish that her impairment prevents her from performing her past work, as well as any other type of work, for at least a twelve-month period.  Boone v. Barnhart, 353 F.3d 203, 205 (3d Cir. 2003) (citing Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000)).  Although Plaintiff and her mother testified as to Plaintiff's physical and mental limitations, this testimony, when considered in light of the medical record, did not show that Plaintiff could not perform substantial gainful activity for at least one year.  Plaintiff, therefore, has not met her burden.

**C.    The ALJ Properly Relied Upon The Vocational Expert's**

**Testimony**

Plaintiff does not argue that the vocational hypothetical offered by the ALJ was flawed.  (See ALJ Decision at 9.)  However, Plaintiff argues that the VE's testimony contained inconsistencies.  (Pl.'s Br. at 13.)  Plaintiff further argues that the VE should not have relied upon the VE's own experience in job placement to determine whether a job with a sit/stand option would be available, but instead should have conducted a labor market survey to determine whether there was such a job available in the national economy.  Id.

The Court disagrees, and finds that the VE's testimony was not inconsistent, and that a labor market survey was neither required nor necessary in determining whether there were jobs available for Plaintiff in the national economy.

After finding that a claimant cannot return to her former occupation, the Commissioner may enlist the assistance of a vocational expert in order to demonstrate that claimant is able to perform other work.  20 C.F.R. §§ 404.1566(e), 416.966(e).  The decision of whether to use a vocational expert to determine whether a claimant's work skills can be used in other jobs, and in which other jobs those skills may be used, is discretionary.  The regulations do not require that labor surveys be conducted in each case.  See Id.

Plaintiff contends that the VE's testimony was "inconsistent" because the VE said that Plaintiff's need to break

20

frequently throughout an eight-hour workday would "preclude employment." (Pl.'s Br. at 13 (quoting Tr. at 394).)  However, it is clear from the hearing transcript that the VE said this in response to a hypothetical from Plaintiff's counsel, in which Plaintiff's counsel directed the VE to assume that Plaintiff would need to break to ice her knee five to six times per workday, for ten minutes each time.  Given that scenario, the VE said that five or six breaks would be considered an "excessive" number of breaks and would "preclude employment." (Tr. at 394.)

The hypothetical from Plaintiff's counsel, i.e., that Plaintiff would need to break five to six times per workday, was not consistent with the record.  Plaintiff testified that she ices her knee four or five times per day. (Tr. at 376-77.) Furthermore, earlier in her testimony, Plaintiff said that her doctors told her to ice her knee "every day, a couple of times a day[.]" (Def.'s Br. at 23 (quoting Tr. at 363) (emphasis added).)  Because the hypothetical question from Plaintiff's counsel was not supported by facts of record, the Court finds that the VE's response to the question does not undermine the VE's opinion as to the availability of jobs for Plaintiff to perform in the national economy.

Plaintiff contends that the only way to know how many jobs exist in Plaintiff's "region" would be to conduct a labor

market survey, and that because no labor market survey was conducted, the ALJ could not have correctly determined that jobs existed that Plaintiff could perform.  (Pl.'s Br. at 13.)  This argument fails for two reasons.

First, the regulations do not require that any work be available for a claimant in the claimant's local area or region, but rather that the possibility of the claimant to work "exists in the national economy[.]"  Second, the regulations do not require a labor market survey.  20 C.F.R. §§ 404.1566, 416.966. As the Third Circuit has noted, the testimony of a vocational expert that is "in response to a hypothetical[,]" such as in this case, fairly setting forth "every credible limitation established by the physical evidence. . . . can be relied upon as substantial evidence" that supports the ALJ's conclusion.  Plummer, 186 F.3d at 431.

The Court finds that the ALJ properly relied upon the VE's testimony, which was in response to a fair hypothetical that the ALJ presented.

**VII.  CONCLUSION**

The Court finds, for the reasons discussed, that the Commissioner's decision was supported by substantial evidence. Accordingly, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's cross-motion for summary judgment. An appropriate Order will follow.